UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| EMD MILLIPORE CORPORATION and MERCK KGAA, DARMSTADT, GERMANY, | * * * * | |
| Plaintiffs, | * * | |
| v. | * * | Civil Action No. 20-cv-10244-ADB |
| HDI-GERLING AMERICA INSURANCE COMPANY, | * * * | |
| Defendant. | * * | |

**MEMORANDUM AND ORDER ON DEFENDANT'S MOTION TO DISMISS AND PLAINTIFFS' CROSS-MOTION FOR SUMMARY JUDGMENT**

BURROUGHS, D.J.

Plaintiffs EMD Millipore Corporation ("EMD") and Merck KGAA, Darmstadt, Germany

("MKDG," and together with EMD, "Plaintiffs") bring this action against Defendant

HDI-Gerling America Insurance Company ("HDI"), their liability insurer, alleging that under

their insurance policies, HDI is obligated to pay for MKDG's defense costs in another litigation.

See generally [ECF No. 1 ("Compl.")].  Plaintiffs seek (1) a declaratory judgment that HDI has a

contractual duty to defend MKDG in that litigation, and (2) damages arising from HDI's alleged

"unfair claims settlement practices" in violation of Massachusetts law.  [Id. at 12].  Currently

before the Court is HDI's motion to dismiss the Complaint in its entirety, [ECF No. 9], and

Plaintiffs' cross-motion for partial summary judgment on the issue of HDI's duty to defend,

[ECF No. 19].  For the reasons set forth below, HDI's motion to dismiss, [ECF No. 9], is

GRANTED, and Plaintiffs' motion for partial summary judgment, [ECF No. 19], is DENIED.

## I.    BACKGROUND

The parties do not dispute the material facts which the Court draws from the complaint and the documents attached to the parties' filings, including the insurance policies and the complaint in the underlying litigation against MKDG.

### A.    The Parties

EMD is a Massachusetts corporation with its principal place of business in Burlington, Massachusetts.  [Compl. ¶ 7].  It is a supplier for companies that research, develop, and produce biotechnology and pharmaceutical drug therapies.  [Id.].  MKDG is a German multinational pharmaceutical, chemical, and life sciences company that indirectly owns EMD and has its principal place of business in Darmstadt, Germany.  [Id.].  HDI is an Illinois corporation with its principal place of business in Illinois.  [Id. ¶ 8].  Among other things, HDI provides commercial insurance policies.  See [id. ¶ 11].

### B.    The Policies

EMD purchased two claims-made commercial general liability insurance policies from HDI: a primary policy and an umbrella policy.  See [ECF Nos. 1-3 (primary), 1-4 (umbrella)]. Each policy covers claims made between January 1, 2016 and January 1, 2017, and, for present purposes, provides identical coverage.[1]  See [ECF Nos. 1-3 (primary), 1-4 (umbrella)];  [ECF No. 24 at 2 (HDI admitting that the relevant provisions in the two policies are identical)]. Although EMD is the policyholder, MKDG is a named insured under each policy.[2]  See [ECF No. 1-3 at 27; ECF No. 1-4 at 59].

---

[1] Given that the relevant policy provisions are identical, when citing specific provisions, the Court will cite only to the primary policy.

[2] Accordingly, when interpreting policy language, MKDG qualifies as an "insured."

The policies cover a number of risks.  Under the policies, HDI is obligated to pay, among other things, "those sums that the insured becomes legally obligated to pay as damages because of 'personal and advertising injury' to which this insurance applies" and "ha[s] the right and duty to defend the insured against any 'suit' seeking those damages."[3]  [ECF No. 1-3 at 13]. "[P]ersonal and advertising injury" is defined as "injury, including consequential 'bodily injury,' arising out of one or more" of the listed "offenses."  [Id. at 23].  The offenses include, among others, "[o]ral or written publication, in any manner, of material that slanders or libels a person or organization or disparages a person's or organization's goods, products or services" and "[t]he use of another's advertising idea in [an insured's] 'advertisement.'"  [Id. at 23–24].  The policies do not define "disparage" or "advertising idea."  See [id. at 21–25].

The policies include multiple exclusions from the personal and advertising injury coverage.  See [ECF No. 1-3 at 13–15].  The parties point to two as being potentially relevant here.  First, the "Breach of Contract" exclusion excludes liability for "'personal and advertising injury' arising out of a breach of contract, except an implied contract to use another's advertising idea in [an insured's] 'advertisement.'"  [Id. at 14].  Second, the "Infringement of Copyright, Patent, Trademark or Trade Secret" exclusion (the "IP Exclusion") excludes liability for "'personal and advertising injury' arising out of the infringement of copyright, patent, trademark, trade secret or other intellectual property rights."  [Id.].  The IP Exclusion further states that "such other intellectual property rights do not include the use of another's advertising idea in [an insured's] 'advertisement,'" and that the exclusion "does not apply to infringement, in [an insured's] 'advertisement,' of copyright, trade dress or slogan."  [Id.].

---

[3] The policies define "suit" as a "civil proceeding in which damages because of 'bodily injury,' 'property damage' or 'personal and advertising injury' to which this insurance applies are alleged."  [ECF No. 1-3 at 24].

C.      **The New Jersey Litigation**

On January 15, 2016, Merck & Co., Inc. and Merck Sharp & Dohme Corp. (collectively, "Merck")[4] sued MKDG in the United States District Court for the District of New Jersey (the "NJ Litigation"). See [ECF No. 1-5 ("NJ Litig. Compl.")]. Merck's complaint asserts federal claims for trademark infringement, trademark dilution, unfair competition, false advertising, and cybersquatting, and New Jersey state law claims for trademark infringement, trademark dilution, unfair competition, deceptive trade practices, and breach of contract. [Id. ¶¶ 86–159]. Because Merck's allegations in the NJ Litigation are relevant to the parties' coverage dispute in the instant case, the Court summarizes them here.

Despite their common heritage, Merck and MKDG have been unrelated entities for longer than a century.[5] [NJ Litig. Compl. ¶¶ 10–11]. To fairly navigate the global marketplace with their shared name, the two companies have entered into coexistence agreements, which govern what each company can and cannot do in various jurisdictions around the world regarding the use of "MERCK." [Id. ¶¶ 11–12]. Pursuant to these coexistence agreements, MKDG cannot use the trademark "MERCK," or attempt to acquire rights in any trademark containing "MERCK," in the United States or Canada. [Id. ¶ 13]. Over the years, both via litigation and informally, Merck and MKDG have disputed their respective uses, on the internet and otherwise, of "MERCK" in multiple jurisdictions. [Id. ¶ 14]. Until recently, they had not

---

[4] Merck Sharp & Dohme Corp., a New Jersey corporation that manufactures and sells pharmaceutical products, is Merck & Co., Inc.'s wholly owned subsidiary. [NJ Litig. Compl. ¶¶ 2–3].

[5] In the seventeenth century, members of the Merck family formed a business in Germany that would later expand to the United States. That U.S. business was organized in 1891 as a subsidiary of the German business. During the First World War, the U.S. government seized the U.S. company stock owned by German interests and sold it to a U.S. citizen, severing the two companies. See [NJ Litig. Compl. ¶¶ 10–11].

resolved the extent to which MKDG would use "MERCK" in the United States because MKDG had not directed the "MERCK" name to the United States and had not used it in connection with business activities in direct competition with Merck in the United States.  [Id. ¶¶ 16–17].

In the United States, Merck has expended resources building the "MERCK" brand and has acquired goodwill in the "MERCK" trademark and trade name, and other trademarks and trade names containing the word "MERCK."[6]  [NJ Litig. Compl. ¶ 27].  Merck and its affiliates have used these trademarks and trade names in the United States for more than a century and continue to use them.  [Id. ¶¶ 28–31].  These trademarks and trade names are well-known in the United States because of Merck's sales and promotional efforts with respect to Merck's medicines, vaccines, and animal health products.  [Id. ¶ 32].

Pursuant to the coexistence agreements, MKDG is permitted to use the word "Merck" as part of a firm or corporate name in the United States but only in the phrase "E. Merck, Darmstadt, Germany," and only if the four words are given equal prominence.  [NJ Litig. Compl. ¶ 36].  Nevertheless, MKDG has used the trade names "MERCK," "Merck KGaA," and "Merck KGaA, Darmstadt, Germany" in the United States.  [Id. ¶ 37].  Moreover, Merck alleges that MKDG's use of the designation "Merck KGaA" and its reference to itself as "MERCK" are so prominent and widespread that they function as a trademark.  [Id. ¶ 39].  In sum, according to Merck, MKDG "holds itself out to be 'MERCK' . . . thereby infringing and diluting the distinctive quality of the MERCK Mark and Trade Names."  [Id. ¶ 40].

In the NJ Litigation, Merck's factual allegations fit into three broad categories.

---

[6] These trademarks and tradenames include "MERCK," "MERCK & Design," "MERCK ACADEMY," "THE MERCK MANUAL," "MERCK ONCALL," and "MERCKVACCINES.COM."  [NJ Litig. Compl. ¶ 29].

First, Merck identifies roughly a dozen examples of MKDG's allegedly improper use of the "MERCK" trademark or trade name in the United States, including but not limited to: (1) MKDG's use of "Merck" or "Merck KGaA Darmstadt, Germany" in various places on EMD's website, [NJ Litig. Compl. at ¶¶ 43–47]; (2) MKDG's promotion and sale of its products "SedalMerck®," "Merckognost®," and "MRCKβ Protein" on EMD's website, [id. ¶¶ 48, 60]; (3) MKDG's use of the name "MERCK" on its Facebook and Twitter pages and YouTube channel, [id. ¶¶ 50, 59]; (4) MKDG's issuance of various press releases using "Merck," [id. ¶¶ 51–54]; and (5) MKDG's use of "Merck" and "U.S. Merck" on signage at its kiosks at multiple industry conferences, [id. ¶¶ 55–58].

Second, Merck alleges that MKDG has advanced two marketing campaigns specifically intended to confuse consumers as to MKDG's history.  As part of MKDG's "Original" campaign, company employees have referred to MKDG as "the Original Merck" and have referred to Merck as MKDG's "younger brother/sister."  [NJ Litig. Compl. ¶¶ 61–63].  Merck asserts that this campaign is an attempt by MKDG to (1) associate its goods and services with the "MERCK" trademark and (2) "dilute the distinctive quality of the MERCK trademark in the United States."  [Id. ¶ 64].  MKDG also launched the "125 Years" campaign in which it highlighted the fact that it has been in the United States for 125 years, even though, in reality, MKDG has been re-established in the United States only since 1971.  [Id. ¶¶ 65–66, 68–69]. According to Merck, this campaign is "likely to deceive consumers as to [MKDG]'s history in the United States and trades off of the good will associated with Merck, through lessening such good will and its association with Merck."  [Id. ¶ 67].

Third, Merck alleges that MKDG registered a number of website domain names that are virtually identical to Merck's trademark registration for "THE MERCK MANUAL."  [NJ Litig.

Compl. ¶ 70].  When users access those websites, they are redirected to MKDG's website.  [Id.
¶¶ 70, 72].

Merck points to evidence suggesting that MKDG's actions have already confused people
and therefore harmed Merck.  Merck asserts, among other things, that: (1) a researcher in the
United States emailed goi_emdserono@merckgroup.com, believing she was communicating
with Merck, although she was actually communicating with MKDG, [NJ Litig. Compl. ¶ 74];
(2) a Twitter user attributed one of MKDG's initiatives to Merck, [id. ¶ 75]; and (3) multiple
media sources reporting on MKDG's activity referred to MKDG as Merck and/or otherwise
attributed MKDG's performance (e.g., negative results in drug trials) to Merck, even using
Merck's New York Stock Exchange ticker symbol (MRK) and corporate logo, [id. ¶¶ 76–80].

### D.    Procedural Background

After being sued by Merck, MKDG promptly tendered its defense to HDI.  [Compl.
¶ 28].  HDI refused to defend, maintaining that because the NJ Litigation does not implicate the
policies, it has no duty to defend MKDG.  [Id. ¶¶ 4–5, 29; ECF No. 1-6 (letter from HDI refusing
to defend MKDG)].  On February 7, 2020, Plaintiffs filed their Complaint in this action.
[Compl.].  HDI moved to dismiss for failure to state a claim on April 2, 2020, [ECF No. 9], and
on May 14, 2020, Plaintiffs simultaneously opposed that motion and moved for partial summary
judgment as to HDI's duty to defend, [ECF No. 19].  On June 4, 2020, HDI filed a reply on its
motion to dismiss and opposed Plaintiffs' motion for partial summary judgment.  [ECF No. 23].
Plaintiffs filed a reply in support of their partial summary judgment motion on June 18, 2020,
[ECF No. 27], and HDI filed a sur-reply on June 24, 2020, [ECF No. 33].

## II.    DISCUSSION

The parties agree that Massachusetts law governs, see [ECF No. 10 at 12; ECF No. 20 at

13–14], and the Court will therefore apply it.  Borden v. Paul Revere Life Ins. Co., 935 F.2d 370,

375 (1st Cir. 1991) ("Where, however, the parties have agreed about what law governs, a federal

court sitting in diversity is free, if it chooses, to forgo independent analysis and accept the

parties' agreement.").  Under Massachusetts law, "the interpretation of an insurance policy

typically embodies a question of law for the court."  Vt. Mut. Ins. Co. v. Zamsky, 732 F.3d 37,

42 (1st Cir. 2013).

> The law regarding an insurer's duty to defend is well-settled in Massachusetts.  The duty to defend is broader than the duty to indemnify.  In order to determine whether an insurer has a duty to defend, a comparison must be made of the facts alleged in the underlying complaint with the insurance policy provisions.  If the allegations of the complaint are reasonably susceptible of an interpretation that they state or adumbrate a claim covered by the policy terms, the insurer has a duty to defend.  In sum, [t]he obligation of an insurer to defend is not, and cannot be, determined by reference to the facts proven at trial.  Rather, the duty to defend is based on the facts alleged in the complaint and those facts which are known by the insurer. [I]nformation derived from outside the complaint may not serve to negate the duty to defend.

> Determining the existence *vel non* of the duty to defend requires a court to consider what kind of losses may be proved as lying within the range of the allegations of the complaint, and then see whether any such loss fits the expectation of protective insurance reasonably generated by the terms of the policy.  Put differently, we ask what an objectively reasonable insured, reading the relevant policy language, would expect to be covered.

> The insured initially bears the burden of showing that the allegations in the underlying complaint fit within the covered risks in the policy.  Once the insured has satisfied this burden, it falls to the insurer to prove the applicability of one or more separate and distinct exclusionary provisions.  Both determinations—whether an allegation creates the possibility of a covered claim, and whether an exclusion applies to relieve an insurer of its duty to defend—depend on whether the insured would have reasonably understood the exclusion to bar coverage.

Essex Ins. Co. v. BloomSouth Flooring Corp., 562 F.3d 399, 403–04 (1st Cir. 2009) (second

alteration in original) (internal citations and quotation marks omitted).  "Courts look to 'the

source from which the [underlying litigation] plaintiff's [] injury originates rather than specific theories of liability alleged in the complaint' to determine whether the policy covers the claims under this standard." Scottsdale Ins. Co. v. Byrne, 913 F.3d 221, 228 (1st Cir. 2019) (quoting Bagley v. Monticello Ins. Co., 720 N.E.2d 813, 817 (Mass. 1999)).  Further, Massachusetts applies the "in for one, in for all" approach, meaning that "where an insurer is obligated to defend an insured on one of the counts alleged against it, the insurer must defend the insured on all counts, including those that are not covered."  Mount Vernon Fire Ins. Co. v. Visionaid, Inc., 76 N.E.3d 204, 210–11 (Mass. 2017).

Because the interpretation of an insurance policy is a question of law, the Court's task is to compare the allegations in the NJ Litigation complaint with the language of the policies to determine whether HDI has a duty to defend.  If there is a duty to defend, the Court will grant Plaintiffs' motion and deny HDI's, and if not, the Court will grant HDI's motion and deny Plaintiffs'.[7]

---

[7] In connection with their reply in further support of their motion for partial summary judgment, Plaintiffs filed a transcript excerpt from the June 20, 2018 deposition of Gerard Devlin, Merck's Federal Rule of Civil Procedure 30(b)(6) corporate designee in the NJ Litigation, during which Mr. Devlin characterized Merck's claims against MKDG.  [ECF No. 29-1 (deposition excerpt); ECF No. 29 ¶ 6 (affidavit providing background)].  "[T]he duty to defend is based on the facts alleged in the complaint [filed in the underlying litigation] and those facts which are known by the insurer."  Bos. Symphony Orchestra v. Com. Union Ins. Co., 545 N.E.2d 1156, 1158 (Mass. 1989); see also Open Software Found., Inc. v. U.S. Fidelity and Guar. Co., 307 F.3d 11, 15 (1st Cir. 2002) (noting that insurers should examine "facts that it knows or readily should know in order to determine whether coverage exists").  Here, Plaintiffs have not averred, let alone provided any support for the notion, that HDI knew, or should have known about, Mr. Devlin's testimony, which came two years after Merck initiated the NJ Litigation and HDI refused to defend MKDG.  As such, Mr. Devlin's testimony cannot form the basis for HDI's duty to defend.  Accordingly, in assessing HDI's duty to defend, the Court will not consider Mr. Devlin's deposition testimony characterizing Merck's claims against MKDG and will instead rely only on Merck's allegations as they are set forth in the NJ complaint.

### A.       Merck's Allegations Do Not Trigger HDI's Duty to Defend

HDI is obligated to defend MKDG in "suits" seeking damages for "personal and advertising injury" covered by the policies.  [ECF No. 1-3 at 13].  The parties do not dispute that the NJ Litigation qualifies as a "suit."  They do, however, contest whether, in that suit, Merck seeks damages for "personal and advertising injury" covered by the policies.  Accordingly, the Court must decide whether, in the NJ Litigation, Merck seeks damages for an injury "arising out of" one of the policies' enumerated offenses.  It is Plaintiffs' burden to demonstrate that Merck's allegations are reasonably susceptible of an interpretation that places any of the claims against MKDG within the risks covered by the policies.  Essex Ins., 562 F.3d at 403–04.

Plaintiffs argue that two grants of coverage apply to Merck's claims against MKDG in the NJ Litigation: (1) the grant of coverage for personal and advertising injury arising out of MKDG's alleged use of Merck's advertising idea, see [ECF No. 20 at 15–17], and (2) the grant of coverage for personal and advertising injury arising out of MKDG's alleged publication of material that disparages Merck's goods, products, or services, [id. at 17–20].  HDI maintains that neither grant of coverage is applicable to Merck's claims against MKDG in the NJ Litigation because Merck did not accuse MKDG of stealing its advertising idea, [ECF No. 10 at 20–22; ECF No. 23 at 17–20], or of disparaging it, [ECF No. 10 at 14–19; ECF No. 23 at 20–24].

The relevant policy provisions state:

> Personal and advertising injury means injury, including consequential 'bodily injury', arising out of one or more of the following offenses: . . . Oral or written publication, in any manner, of material that slanders or libels a person or organization or disparages a person's or organization's goods, products or services; [or] . . . The use of another's advertising idea in [an insured's] 'advertisement' . . . .

[ECF No. 1-3 at 23].  The policies do not define "disparage" or "advertising idea."  See generally [id. at 21–25].

1.      Use of Another's Advertising Idea

Here, the relevant question is whether Merck's factual allegations in the NJ Litigation can reasonably be interpreted as alleging an injury arising out of MKDG's use of Merck's advertising idea.  Scottsdale Ins. Co., 913 F.3d at 228.  "Under Massachusetts law, 'arising out of' indicates a wide range of causation . . . [and] 'is generally understood to mean "originating from," "growing out of," "flowing from," "incident to," or "having connection with."''" Sterngold Dental, LLC v. HDI Glob. Ins. Co., 929 F.3d 1, 8 (1st Cir. 2019) (quoting Brazas Sporting Arms, Inc. v. Am. Empire Surplus Lines Ins. Co., 220 F.3d 1, 7 (1st Cir. 2000)). Because the policies do not define "advertising idea," the Court must "interpret the words in light of their plain meaning, . . . giving full effect to the document as a whole[,] . . . consider[ing] what an objectively reasonable insured, reading the relevant policy language, would expect to be covered . . . [and] interpret[ing] the provision of the standard policy in a manner consistent with the statutory and regulatory scheme that governs such policies."  Holyoke Mut. Ins. Co. in Salem v. Vibram USA, Inc., 106 N.E.3d 572, 577 (Mass. 2018) (alterations in original) (internal quotation marks omitted).

In Holyoke, the Supreme Judicial Court ("SJC") interpreted the phrase "advertising idea" in an insurance coverage dispute.[8]  106 N.E.3d at 578–81.  In that case, the insured was a "producer of minimalistic shoes that simulate walking and running barefoot."  Id. at 575.  The living heirs of Abebe Bikila, a famed Olympic barefoot marathoner, sued the insured, alleging that it had misused the Bikila name in advertising and promoting a shoe designed to simulate the

---

[8] The relevant policy language at issue in Holyoke is identical to the policy language here. Compare Holyoke, 106 N.E.3d at 575 ("[t]he use of another's advertising idea in your 'advertisement.'"), with [ECF No. 1-3 at 23 ("[t]he use of another's advertising idea in your 'advertisement'").

sensation of running barefoot, which it called the "Bikila model" shoe.  Id.  The Bikila family further claimed that they operated a sporting goods store called "Abebe Bikila," published a book about Abebe Bikila's history and marathon career, had the right to and had authorized the use of Abebe Bikila's name and life rights in a commercial and a film, and operated a website containing information regarding Abebe Bikila's life and legacy.  Id.  The insured argued that the Bikila family's claims against it triggered the insurers' duty to defend under the policy, which covered claims for "use of another's advertising idea," because the Bikila family alleged that they advertised their commercial ventures by intentionally associating with Abebe Bikila's name and legacy, and further, that the insured used the same advertising tactics.  Id. at 577.  The SJC agreed.  Id.  After noting that the Third Circuit defined the term "advertising idea" broadly and surveying cases finding a "wide variety of concepts, methods, and activities related to calling the public's attention to a business, product, or service constitute advertising ideas," see id. at 578, the SJC concluded that the "Bikila family's advertising idea was using the name 'Bikila,' and the legacy that name conveyed, to attract business to each of their ventures."  Id. at 580.  The SJC further held that because the Bikila family alleged that the insured had used "Bikila" to advertise its products, the Bikila family's claims against the insured triggered the duty to defend because they were based on the insured's use of their advertising idea.  Id.

Plaintiffs argue that the SJC's decision in Holyoke is directly on point and necessarily leads to the conclusion that Merck alleges injury arising out of, at least in part, MKDG's use of Merck's advertising idea in its advertisements.  [ECF No. 20 at 15–17].  According to Plaintiffs, the advertising idea is using the "MERCK" name, in connection with the "Original" and "125 Years" campaigns, to draw attention to the business and attract customers.  [Id. at 16–17].  HDI counters by arguing that Merck did not allege that it had used either "Original" or "125 Years" as

a way of drawing attention or attracting customers and therefore, the advertising idea that MKDG is alleged to have used is not "another's."  [ECF No. 23 at 17–18].[9]

In the NJ Litigation, Merck alleges the following facts: (1) it uses various "MERCK" names with various pharmaceutical products, as well as related goods and services, [NJ Litig. Compl. ¶ 31]; (2) it has undertaken "extensive and widespread sales and promotional efforts in relation to the products and services offered in association with these marks and names," [id. ¶ 32]; (3) "[a]s a result of Merck's continuous use, advertising and promotion, *inter alia*, the MERCK Marks and Trade Names have acquired significant goodwill in the United States and, indeed, are famous," [id. ¶ 34]; (4) MKDG "has encouraged employees . . . to promote [MKDG] as the 'Original,'" [id. ¶ 61]; (5) senior MKDG personnel have referred to MKDG as "the Original Merck" during "presentations and interviews," [id. ¶ 62]; (6) at a 2015 Bio-Pharma Sustainability Conference, MKDG personnel introduced the company as "the Original Merck" and then referred to Merck as MKDG's "younger brother/sister," [id. ¶ 63]; (7) MKDG has an advertising campaign premised on MKDG's "125 Years in the U.S.," [id. ¶ 65]; (8) MKDG ran a "125 Years" advertisement at the 2015 BIO International Convention in Philadelphia, [id. ¶ 68]; and (9) MKDG ran a "125 Years" advertisement in the Washington Post, [id. ¶ 69].

Even considering the lenient standard for assessing an insurer's duty to defend, see Essex Ins., 562 F.3d at 403 ("If the allegations of the complaint are 'reasonably susceptible' of an interpretation that they state or adumbrate a claim covered by the policy terms, the insurer has a duty to defend"), Merck's complaint does not trigger HDI's duty to defend because Merck

---

[9] HID also distinguishes Holyoke based on the fact that the "Bikila" name was not a trademark, whereas "MERCK" is, and cites to the First Circuit's decision in Sterngold Dental.  [ECF No. 23 at 19].  In Sterngold Dental, however, the First Circuit expressly avoided deciding whether the underlying litigation involved a claim for an injury arising out of "use of another's advertising idea."  929 F.3d at 7–8.

plainly does not allege an injury arising out of MKDG's use of Merck's advertising idea.  More specifically, Merck does not allege that it engaged in advertising campaigns similar to MKDG's "Original" or "125 Years" campaigns or that it advertised based on its status as the original MERCK entity in the United States or as the entity that has continuously operated here the longest.  To the contrary, the few allegations in the NJ Litigation complaint about Merck's advertising efforts are so vague that it is impossible to divine anything about the content of its advertisements or the style, manner, or method in which it advertises.  See [NJ Litig. Compl. ¶ 32 ("The MERCK Marks and Trade Names are well-known in the United States as a result of extensive and widespread sales and promotional efforts in relation to the various innovative medicines, vaccines, and animal health products, and other products and services offered in association with these marks and names."); id. ¶ 34 ("As a result of Merck's continuous use, advertising and promotion, *inter alia*, the MERCK Marks and Trade Names have acquired significant goodwill in the United States and, indeed, are famous.")].  This lack of detail leaves the Court unable to identify which "advertising idea" of Merck's MKDG is alleged to have used.  For this reason, an "objectively reasonable insured" in MKDG's position would not expect Merck's claims against it to be covered under this particular grant of coverage.  See Essex Ins., 562 F.3d at 404.

Notwithstanding Plaintiffs' arguments, the SJC's decision in Holyoke does not dictate a different result.[10]  In Holyoke, the Bikila family made specific factual allegations about their advertising efforts, centered around the name "Bikila" and its legacy.  See Holyoke, 106 N.E.3d

---

[10] The other cases that Plaintiffs cite are non-binding and/or can be factually distinguished.  See, e.g., Native Am. Arts, Inc. v. Hartford Cas. Ins. Co., 435 F.3d 729 (7th Cir. 2006) (insured mimicked its competitor's advertisements by placing similar focus on the authenticity of goods); Am. Simmental Ass'n v. Coregis Ins. Co., 282 F.3d 582, 587 (8th Cir. 2002) (competitor, who used the term "fullblood" to describe its cattle, accused the insured of doing the same).

572 at 579–80 (listing specific methods of advertising and promotions).  Here, Merck has alleged nothing about its advertisements except that they exist.  Put differently, though Merck has alleged that MKDG used an advertising idea (i.e., attempting to attract customers by heralding MKDG's history and longstanding ties to the United States), as distinguished from the Bikila family, Merck has not alleged that MKDG used *its* advertising idea.

Accordingly, after comparing the allegations in Merck's NJ Litigation complaint to the language of the policies, the Court finds that the allegations cannot be reasonably interpreted as stating a claim that fits within the "use of another's advertising idea" risk covered by the policies.

2.    Publication of Material that Disparages an Organization's Goods, Products, or Services

Here, the relevant question is whether, in the NJ Litigation, Merck alleges an injury that can be reasonably interpreted as arising out of MKDG's publication of material that disparages Merck's goods, products, or services.  See Scottsdale Ins. Co., 913 at 228; Essex Ins., 562 F.3d at 403.  As noted above, "arising out of" is construed broadly, Sterngold Dental, 929 F.3d at 8, and because the policies do not define "disparage," the Court must "interpret the word[] in light of [its] plain meaning, . . . giving full effect to the document as a whole[,] . . . consider[ing] what an objectively reasonable insured, reading the relevant policy language, would expect to be covered . . . [and] interpret[ing] the provision of the standard policy in a manner consistent with the statutory and regulatory scheme that governs such policies."  Holyoke 106 N.E.3d at 577.

As a starting point, the Court looks to relevant authority to determine the meaning of the term "disparage."  The SJC decided an insurance dispute regarding a policy containing the similar, albeit not identical, term "other defamatory or disparaging material."  Bos. Symphony Orchestra, Inc. v. Com. Union Ins. Co., 545 N.E.2d 1156 (Mass. 1989).  In that case, the SJC

observed that "[d]isparage means, among other things, 'to lower in rank and estimation by actions or words,' or 'to speak slightingly of.'"  Id. at 1159 (quoting Webster's New International Dictionary of the English Language 750 (2d ed. 1959)).  Consistent with that, both legal and general-use dictionaries define "disparage" to mean speaking or writing about another in a derogatory manner.  See, e.g., Disparage, Black's Law Dictionary (11th ed. 2019) ("To speak slightingly of; to criticize (someone or something) in a way showing that one considers the subject of discussion neither good nor important."); Disparage, Merriam-Webster, https://www.merriam-webster.com/dictionary/disparage (last visited January 7, 2021) ("to depreciate by indirect means (such as invidious comparison): speak slightingly about"); Disparage, Cambridge Dictionary, https://dictionary.cambridge.org/us/dictionary/english/disparage (last visited January 7, 2021) ("to criticize someone or something in a way that shows you do not respect or value him, her, or it").  Although the policies use the term "disparage," not "disparagement," it is also instructive to examine the tort of disparagement.  Under Massachusetts law, to state a claim for commercial disparagement, the plaintiff must show, among other things, that a defendant "published a false statement . . . 'of and concerning' the plaintiff's products or services."  HipSaver, Inc. v. Kiel, 984 N.E.2d 755, 763 (Mass. 2013).

Plaintiffs argue that Merck's allegations concerning the "Original" and "125 Years" campaigns are sufficient to sketch out a claim for disparagement because the statements made in those campaigns are false and function as statements about Merck and its products by implication (i.e., that Merck is not the original "MERCK" entity and that MKDG has been operating in the United States longer than Merck has).  [ECF No. 20 at 18–20].  HDI maintains that Merck does not allege an injury arising out of disparaging material because it does not identify any statement by MKDG disparaging Merck or otherwise portraying it in a negative

16

light. [ECF No. 10 at 14–19; ECF No. 23 at 20–24]. Rather, Merck asserts that MKDG has undertaken efforts to emulate and/or associate itself with Merck, which is the opposite of disparagement. [ECF No. 10 at 16–17; ECF No. 23 at 20–21].

Plaintiffs have the burden of showing that Merck's allegations can be reasonably interpreted to state a claim that fits within the covered risks in the policies, Essex Ins., 562 F.3d at 404, and they have failed to do so. The NJ Litigation complaint is devoid of any allegation that MKDG wrote or said anything disparaging about Merck. First, most of the statements that Plaintiffs identify as disparaging are about MKDG, not Merck (i.e., that MKDG is "Original" and that MKDG has been operating in the United States for 125 years). That Merck and MKDG share a name does not render all statements by MKDG about itself disparaging statements as to Merck (even if those statements have the alleged effect of diminishing Merck's standing in the eyes of consumers). Plaintiffs have identified no case where a court construed a company's statements about itself to be disparaging of another company under similar circumstances. See generally [ECF No. 20 at 17–20; ECF No. 27 at 12–14]. Were courts to interpret "disparage" as broadly as Plaintiffs suggest, nearly any form of advertising would be disparaging. For instance, if a restaurant advertised its offerings as "fresh" and "delicious," those labels could, in theory, be viewed as implicitly stating that its competitors' offerings are "stale" and "unpalatable."

Moreover, the policies define "personal and advertising injury" with reference to seven specific offenses, see [ECF No. 1-3 at 23], indicating that injuries arising out of non-enumerated offenses may exist but are not covered. Had the parties intended for claims such as Merck's to be covered, they could have included false advertising or the publication of material adversely affecting an organization's reputation among the enumerated offenses in the policies' definition of "personal and advertising injury." Instead, they included "oral or written publication . . . of

material that . . . disparages a person's or organization's goods, products or services," [id.], which is a narrower injury and a definition that connotes a negative or critical bent.  The Court must respect the plain language of the policy.  Fidelity Coop. Bank v. Nova Cas. Co., 726 F.3d 31, 36–37 (1st Cir. 2013).

Second, the single statement that Plaintiffs identify that is explicitly about Merck (i.e., that Merck is MKDG's "younger brother/sister") is not a pejorative statement about Merck's goods, products, or services.  Even assuming that "younger" is a pejorative term, the statement does not reference any specific good, product, or service of Merck's.[11]

As HDI points out, the thrust of Merck's assertion is that MKDG attempted to improve its own reputation by associating itself with Merck, not that MKDG attempted to sully Merck's reputation by badmouthing its goods or services.  See [NJ Litig. Compl. ¶ 40 ("[MKDG] holds itself out to be MERCK"; id. ¶ 63 (alleging that MKDG "referred to Merck as [MKDG]'s 'younger brother/sister' suggesting some affiliation where there is none"); id. ¶ 64 (alleging that MKDG's acts evidence an "attempt to not only confuse consumers into believing that [MKDG] and its goods and services are produced by or otherwise associated with Merck"); id. ¶ 67 (alleging that the "125 Years" campaign "trades off of the good will associated with Merck"); ¶ 83 ("consumers are likely to erroneously believe that Merck sponsors or is somehow affiliated with [MKDG]")].  While harm resulting from badmouthing would be an injury covered by the policies, harm resulting from falsely implying an affiliation is not.

---

[11] Similarly, even if MKDG's description of itself as the "Original" implies that Merck is not the "Original," or if MKDG's description of itself as having operated in the United States for 125 years implies that Merck has not been operating in the United States for 125 years, neither statement is specifically about goods, products, or services.  Thus, even assuming the statements are about Merck, each statement is about Merck's history and/or identity rather than its goods, products, or services.

In sum, even viewed under the insured-friendly standard governing the Court's consideration of the duty to defend, see Essex Ins., 562 F.3d at 403, Merck's allegations cannot be reasonably interpreted as stating a claim for an injury arising out of MKDG's publication of material that "disparages" Merck's "goods, products or services," [ECF No. 1-3 at 23]. Here, where Merck does not accuse MKDG of criticizing its goods, products, or services, an objectively reasonable insured in MKDG's position would not expect Merck's claims against it to be covered under the grant of coverage for injuries arising out of the publication of disparaging material. See Essex Ins., 562 F.3d at 404.

3.   Summary

Merck's allegations in the NJ Litigation are not reasonably susceptible of an interpretation that they state a claim covered by either grant of coverage relied upon by Plaintiffs. Accordingly, HDI has no duty to defend MKDG in that suit. See Sterngold Dental, 929 F.3d at 10–11 (observing that because there was no coverage under the relevant policy, insurer had no duty to defend). Given this determination, the Court need not consider the exclusions that HDI has identified as potentially applicable. Somerset Sav. Bank v. Chi. Title Ins. Co., 649 N.E.2d 1123, 1128 (Mass. 1995) (noting that once a court has found that a claim is not covered under a policy, it need not consider exclusions).

B.   **Unfair Claims Settlement Practices**

As to Plaintiffs' Chapter 93A and 176D claims for unfair claims settlement practices, see [Compl. ¶¶ 50–56], because the Court has concluded that HDI has no duty to defend MKDG in its suit against Merck, Plaintiffs' claims fail as a matter of law. Home Ins. Co. v. Liberty Mut. Fire Ins. Co., 830 N.E.2d 186, 192 (Mass. 2005) ("An insurer does not commit a violation of G.L. c. 93A when it rightfully declines to defend a claim that is not covered by its policy."

(citing <u>Rischitelli v. Safety Ins. Co.</u>, 671 N.E.2d 1243, 1244 (Mass. 1996))); <u>N. Assurance Co. of</u>
<u>Am. v. Keefe</u>, 845 F. Supp. 2d 406, 422 (D. Mass. 2012) ("Without a wrongful denial of
coverage, [the insured] cannot show that [the insurer] . . . violated G.L. c. 93A, or engaged in an
unfair insurance claim settlement practice in violation of G.L. c. 176D.").

**III.    CONCLUSION**

For the reasons noted above, HDI has no duty to defend, and its motion to dismiss, [ECF
No. 9], is therefore <u>GRANTED</u>.  For the same reasons, Plaintiffs' motion for partial summary
judgment, [ECF No. 19], is <u>DENIED</u>.

**SO ORDERED.**

January 7, 2021                                                    /s/ Allison D. Burroughs
                                                                  ALLISON D. BURROUGHS
                                                                  U.S. DISTRICT JUDGE